UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————————————x

JOHN M., Individually and in his capacity as
Parent of Giovanni M., a Disabled Student,
MICHELE M., Individually, and in her capacity as
Parent of Giovanni M., a Disabled Student, and
GIOVANNI M.,

     Plaintiffs,      11 CV 3634 (PKC) (SIL)

  −against−

BRENTWOOD UNION FREE SCHOOL DISTRICT,

     Defendant.      **MEMORANDUM &**
               **ORDER**

——————————————————————————————x

JOHN M., Individually and in his capacity as
Parent of Giovanni M., a Disabled Student,
MICHELE M., Individually, and in her capacity as
Parent of Giovanni M., a Disabled Student, and
GIOVANNI M.,

     Plaintiffs,      12 CV 2603 (PKC) (SIL)

  −against−

BRENTWOOD UNION FREE SCHOOL DISTRICT,

     Defendant.

——————————————————————————————x

PAMELA K. CHEN, United States District Judge:

  These actions arise from the efforts of Plaintiffs John M. and Michele M. to obtain

reimbursement from Defendant Brentwood Union School Free District (the "District") under the

Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,

for tuition at a private school where Plaintiffs enrolled their child, Giovanni M. ("G.M." and

collectively with parents, "Plaintiffs") for two years, between Fall 2009 and Spring 2011. In two separate decisions, a State Review Officer ("SRO") denied reimbursement for both years after concluding that parents failed to prove that their private school was appropriate. Plaintiffs commenced these federal actions to overturn this aspect of the SRO's decisions,[1] seek attorneys' fees, and assert discrimination claims pursuant to Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101.[2] (11 CV 3634 Dkt. 1; 12 CV 2603 Dkt. 1.) The District now moves for summary judgment on all of Plaintiffs' claims in both actions. (11 CV 3634 Dkt. 43; 12 CV 2603 Dkt. 30.) Plaintiffs cross-move for partial summary judgment, seeking a finding that the SRO erroneously imposed a heightened standard in denying them the requested tuition reimbursement. (11 CV 3634 Dkt. 54; 12 CV 2603 Dkt. 39.) For the reasons set forth below, the District's motions are granted, and Plaintiffs' motions are denied.

## BACKGROUND

### I.   The IDEA

Under the IDEA, New York State is required to provide disabled children with a free and appropriate public education ("FAPE"). *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). A FAPE "must include 'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable

---

[1] Plaintiffs' complaints also sought to annul a portion of another SRO decision that denied Plaintiffs' tuition reimbursement claim for the first year on the basis of *res judicata*. Plaintiffs thereafter withdrew that claim in their summary judgment papers. (11 CV 3634 Dkt. 61 at 2.)

[2] Plaintiffs filed a third action, *G.M. v. O'Brien*, 10 CV 5484 (E.D.N.Y.), which is also pending before this Court. In that action, Plaintiffs assert causes of action not arising out of the State's administrative review processes, but instead allege, *inter alia*, racial discrimination claims under 42 U.S.C. § 1983 based on § 1981 and the Fourteenth Amendment, and ADA and Rehabilitation Act claims, based on G.M.'s treatment while enrolled at a District school. On March 19, 2015, the Court denied summary judgment in that case to the District on Plaintiff's claims under the ADA and Rehabilitation claim.

the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)) (internal citation omitted); *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each [disabled] child." *R.E. ex rel. J.E v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). An IEP is a written statement that "describes the specially designed instruction and services that will enable the child to meet stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (citing *R.E.*, 694 F.3d at 175) (internal quotation marks omitted); *see also* 20 U.S.C. § 1414(d). In New York, local Committees on Special Education ("CSEs")[3] are responsible for determining whether a child is entitled to educational services under the IDEA and, if so, developing an appropriate IEP. N.Y. Educ. Law § 4402(1)(b)(1); *M.W.*, 725 F.3d at 135; *R.E.*, 694 F.3d at 175.

Parents who believe that the State has failed to provide their child with a FAPE as required under the IDEA, 20 U.S.C. § 1412(a)(1)(A), may unilaterally place the child in a private school or program at the parents' own expense and later seek tuition reimbursement. *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006); *see also* 20 U.S.C. §1400(d)(1)(A). In New York, a parent may initiate the tuition reimbursement process by filing a due process complaint with the New York State Department of Education ("DOE"). *M.W.*, 725 F.3d at 135. The due process complaint commences administrative proceedings that initially involve a hearing before an Impartial Hearing Officer ("IHO"), who is appointed by the local board of education. *Id.* (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)). The IHO applies the three-

---

[3] The members of CSEs are appointed by school boards or the trustees of school districts. *Walczak*, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402(1)(b)(1)).

pronged *Burlington/Carter* test, under which: "(1) the [District] must establish that the student's IEP actually provided a FAPE; should the [District] fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 725 F.3d at 135 (citing *R.E.*, 694 F.3d at 184−85).[4] "An IHO's decision may, in turn, be appealed to a [SRO], who is an officer of the [DOE]." *M.H.*, 685 F.3d at 225. Any party aggrieved by the SRO's final administrative decision has the right to seek review of the decision by bringing a civil action in federal court. *See M.W.*, 725 F.3d at 135−36; 20 U.S.C. § 1415(i)(2)(A).

## II.    Factual and Procedural Background

G.M. attended District schools from kindergarten through the fall of his tenth-grade year in a general education setting. (11 CV 3634 Dkt. 45 ("Def. St.") ¶ 3.)[5] In the fall of 2008, while G.M. was attending the tenth grade, his mother advised District school staff that G.M. was being bullied by other students, and that some of the harassment G.M. experienced related to his race. (Def. St. ¶ 5; 10−129 Tr. 343−45, 396−405.) The District school psychologist and other District school staff members subsequently met with G.M. three or four times to engage him in various activities at school. (10−129 Tr. 61, 68.)

In November 2008, the District school psychologist and District social worker met with G.M. to discuss behavioral concerns from his teachers. (*Id.* Tr. 70.) At that meeting, G.M. reported an incident on or about November 5, 2008 in which he was racially harassed by a group

---

[4] The *Burlington/Carter* test is derived from a pair of Supreme Court cases: *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369−70 (1985), and *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12−13 (1993).

[5] Citations to "10−129," "11−023," and "11−153" refer to the administrative records associated with the First, Second, and Third SRO Decisions, respectively, which have been filed under seal with the Court. Citations to "Tr." refer to the transcript from the related due process hearing, and "Ex." to related exhibits submitted by the parties to the IHO.

of students in a school hallway. (*Id.* Tr. 72−73, 347−48, Ex. 3.) District school officials arranged a meeting with G.M.'s mother, and recommended that G.M. be removed from school immediately for his safety and that he undergo a psychiatric evaluation. The school officials indicated that G.M. would be permitted to return to school after a psychiatrist determined that it was safe for him to do so. (11 CV 3634 Dkt. 59 ("Pl. St.") ¶ 1; Def. St. ¶ 8; 10−129 Tr. 76, 354−57, Exs. 1, 3.) Following G.M.'s removal from school in mid−November 2008, the District provided G.M. home instruction for November and December 2008. (Pl. St. ¶ 2; Def. St. ¶ 13; 10−129 Tr. 371, Ex. 1.)

On November 18, 2008, G.M. was evaluated by a private psychiatrist, who diagnosed a paranoid episode and major depressive episode, and recommended psychiatric medication and talk therapy. (Pl. St. ¶ 3; Def. St. ¶ 9; 10−129 Ex. 6.) The psychiatrist opined that "[u]ntil improved, [G.M.] cannot return to school and would benefit from home-tutoring for his own safety as well as his co-students to improve his mental health." (10−129 Ex. 6.) The District also arranged a second evaluation with another psychiatrist on November 26, 2008. (*Id.* Ex. 7.) That psychiatrist diagnosed G.M. as suffering from anxiety, depressive symptoms and behavioral problems related to chronic stressors such as bullying and mocking by his peers. (Pl. St. ¶ 4.) The psychiatrist recommended psychiatric counseling and antidepressant/antianxiety medication. (Def. St. ¶¶ 11−12; 10−129 Ex. 7.)

In late November 2008, G.M. began therapy with a private therapist who is a licensed social worker. (10−129 Exs. H, J.) The therapist rendered an initial diagnosis of adjustment disorder with anxiety and depression as a result of harassment and isolation from peers at school. (Pl. St. ¶ 5; Def. St. ¶ 10; 10−129 Tr. 600−03, Ex. H.) The private therapist continued to treat

G.M., seeing or speaking with G.M. on approximately 49 occasions between late November 2008 and November 2010. (10−129 Ex. H.)

In January 2009, the District advised G.M.'s mother that it wished to return G.M. to the general education setting at the same District high school from which he had been removed in November 2008. (Pl. St. ¶ 6; Def. St. ¶ 14; 10−129 Tr. 370−71.) On or about January 23, 2009, District school officials held a meeting with G.M.'s parents, at which the parents expressed concern regarding returning G.M. to the District school, and indicated that they wished to discuss an alternate placement. (Pl. St. ¶ 7; 10−129 Tr. 374−76.) Ultimately, G.M.'s parents refused to return G.M. to the District school, and the District refused to place him in another school. (Def. St. ¶ 15; *see* Pl. St. ¶¶ 8, 11.)

The District continued to provide home tutoring for G.M. for the balance of the 2008−09 school year. (Def. St. ¶ 16; 10−129 Ex. 11.) Plaintiffs report several problems with regard to G.M.'s home tutoring, including missed sessions with his science teacher, problems understanding his math teacher due to an accent and speech impediment, and the absence of alternative programs for physical education and computer graphics. (10−129 Tr. 377−80, Ex. 11.) G.M. failed his geometry exam, and received a failing mark in physical education at the end of the 2008−09 school year. (*Id.* Tr. 378, Exs. 10−11, C.)

In June 2009, G.M.'s parents unilaterally enrolled him at St. John the Baptist ("St. John's"), a private parochial school, where G.M. continued his education for the 2009−10 and 2010−11 school years, and from which G.M. graduated in 2011. (Pl. St. ¶ 11; Def. St. ¶ 17; 10−129 Tr. 389, Exs. E, G.) G.M. was not classified as a special education student during his two years at St. John's, but was educated in the general student population. (Def. St. ¶¶ 20, 31.) G.M. met with various St. John's staff throughout his time at St. John's, including approximately

ten conversations with his guidance counselor in 2010−11.[6]   (Pl. St. ¶¶ 17, 19.)

On or about January 25, 2010, G.M.'s parents filed a due process complaint alleging that the District had removed G.M. from school without due process, that the homebound instruction was insufficient, and that G.M. suffered from anxiety, depressive symptoms, and behavioral problems related to "bullying and chronic mocking by his peers." (10−129 Ex. 1.) They sought reimbursement for tuition and expenses for G.M.'s enrollment at St. John's for the 2009-10 and 2010-11 academic years. On June 11, 2010, an impartial hearing was convened; it concluded on September 27, 2010 after six days of hearings. (10−129 Tr. 1, 199, 337, 494, 555, 745.) On November 23, 2010, the IHO issued a decision finding that (1) the District had violated its obligation to identify and evaluate G.M. as a child suspected of having a disability and in need of special education and related services ("child-find" obligation); (2) the placement at St. John was appropriate for 2009−10; and (3) G.M.'s parents were entitled to tuition reimbursement for that year. (*Id.* at IHO Decision ("First IHO Decision") at 19, 21.) The IHO denied the request for reimbursement for 2010−11, however, finding that the request was premature. (*Id.* at 22.)

On March 28, 2011, the SRO annulled the IHO's decision to award reimbursement and sustained the District's appeal. The SRO found that although the District failed to meet its child-find obligations, the parents did not meet their burden to prove that the program at St. John's was specifically designed to meet G.M.'s needs. The SRO thus found that the parents were not entitled to tuition reimbursement for the 2009−10 year. (10−129 at Decision No. 10−129 ("First SRO Decision") at 12−14.) The SRO further sustained the IHO determination that the parents' claim for reimbursement for the 2010−11 school year was premature. (*Id.* at 16.)

---

[6] None of the school staff with whom G.M. met were psychologists or social workers and had training in these areas. (*See* 11−153 Tr. 314−15; *see generally id.* at Tr. 286−90; 471−79.)

The parents filed a second due process complaint notice dated November 15, 2010, alleging the same facts as their first complaint and seeking reimbursement for the 2009−10 and 2010−11 school years. (11−023 Ex. 1.) On December 28, 2010, an impartial hearing convened with a pre−hearing conference, during which the District argued that the due process complaint notice should be dismissed on *res judicata* grounds because the issues had been adjudicated in the First IHO hearing. After receiving briefing on the issue, the IHO issued a decision in which he dismissed the November 2010 complaint pursuant to *res judicata*. (11−023 at IHO Decision ("Second IHO Decision").)

On April 19, 2011, the SRO agreed with the IHO that *res judicata* precluded the parents' complaint as it related to the 2009−10 school year, but did not bar the parents' 2010−11 tuition reimbursement claim, because no final decision on the merits of that claim had been reached in the First IHO Decision. (11−023 at Decision No. 11−023 ("Second SRO Decision") at 2−6.) Accordingly, the SRO remanded the matter to the IHO for a new hearing on the 2010−11 reimbursement claim. (*Id.* at 6.)

An impartial hearing was reconvened on May 11, 2011, and concluded on September 2, 2011. Based on a five-day hearing, the IHO found that the District had failed its child-find obligations and that the failure amounted to a denial of a FAPE. (11−153 at IHO Decision ("Third IHO Decision") at 1.) Additionally the IHO concluded that St. John's was an appropriate educational placement for the 2010−11 school year and that G.M.'s parents were entitled to tuition reimbursement. (*Id.* at 2−3.)

On January 23, 2012, upon the District's appeal, the SRO issued a decision affirming the IHO's conclusion that the District had violated its child-find obligations with respect to the

2010−11 school year. (11−153 at Decision No. 11−153 ("Third SRO Decision") at 11.)[7] However, assuming that G.M. was eligible for special education services, the SRO concluded that G.M.'s parents were not entitled to tuition reimbursement for 2010−11 because they had failed to demonstrate how the program at St. John's was specially designed to meet G.M.'s unique needs that year. (*Id.* at 16.)

Plaintiffs filed the instant appeals challenging the SRO's findings that the District was not required to reimburse G.M.'s parents for his 2009-10 and 2010-11 tuition at St. John's because they had failed to meet their burden to demonstrate that their unilateral placement of G.M. at St. John's was appropriate. (11 CV 3634 Dkt. 1 ¶¶ 55−57; 12 CV 2603 Dkt. 1 ¶¶ 72−74.) Plaintiffs also assert claims pursuant to the Rehabilitation Act and the ADA, alleging that the District's actions were undertaken in bad faith or as a result of gross misjudgment. (11 CV 3634 Dkt. 1 ¶¶ 74, 82; 12 CV 2603 Dkt. 1 ¶¶ 84, 92.)

The District presently moves for summary judgment to dismiss Plaintiffs' complaints in their entirety. (11 CV 3634 Dkt. 43; 12 CV 2603 Dkt. 30.)[8] Plaintiffs cross-move for partial summary judgment, claiming that the SRO erroneously imposed a heightened standard in

---

[7] The SRO noted that "the hearing record [was] insufficiently developed" and "inadequate to reach a reasoned, conclusive finding" on whether G.M. was eligible for special education and related services under federal and State regulations. (Third SRO Decision at 11.)

[8] The District devotes a portion of its motion papers to the argument that the SRO correctly found that there was insufficient evidence that G.M., in fact, qualified for special services. (11 CV 3634 Dkt. 46 at 31.) Plaintiffs have not challenged this portion of the Third SRO Decision, and the Court agrees with Plaintiffs that the SRO did not make a conclusive determination on this point. Rather, the SRO's decision *assumed* that G.M. was a qualified student with a disability who required special education services, and accordingly based his decision on the finding that G.M.'s parents had not demonstrated that their placement was appropriate. (*See* Third SRO Decision at 13, 16.) Thus, the question of whether the SRO correctly found that there was insufficient record support for G.M.'s need for special services is not before the Court.

denying reimbursement and seeking a ruling awarding Plaintiffs reimbursement as well as attorneys' fees and costs. (11 CV 3634 Dkt. 54; 12 CV 2603 Dkt. 39.)

## DISCUSSION

### I. <u>Standard of Review</u>

Although the parties seek relief via cross-motions for summary judgment, such a motion in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dept't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (quotation omitted); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions.") (internal quotation marks and citation omitted)). The district court must conduct an independent judicial review to determine whether the SRO's decision is supported by "the preponderance of the evidence," based on the record from the administrative proceedings. *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 380 (2d Cir. 2003) (citation omitted); *Walczak*, 142 F.3d at 129.

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo*, 489 F.3d at 112 (quotation marks omitted). "While the district court must base its decision 'on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal citations, quotations, and alterations omitted). Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.,* 725 F.3d at 139.

Where, as here, the IHO and the SRO reach conflicting decisions, federal courts generally "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246. However, the deference owed to the SRO's decision "depends on the quality of that opinion." *R.E.*, 694 F.3d at 189. The Court must consider "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* at 189 (quoting *M.H.*, 685 F.3d at 244). Where an SRO's decision is insufficiently reasoned to merit the deference to which it is normally entitled, it is appropriate for the district court to consider the IHO's analysis. *M.H.*, 685 F.3d at 246. On the other hand, "[w]here an SRO has clearly demonstrated a better command of the record and supported her conclusions through better legal and factual analysis than an IHO, [courts] will have little difficulty deferring to the SRO's opinion." *M.W.*, 725 F.3d at 139.

## II.     Tuition Reimbursement

The IDEA permits parents to seek reimbursement for their unilateral private placement of a child who has not received a FAPE, even if the child has not previously received special education or related services from a public school. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 241 (2009). To receive reimbursement, a parent must establish that the unilateral placement was at an appropriate site and that the equities favor them. *M.W.*, 725 F.3d at 135. Because the SRO's decisions that G.M.'s parents were not entitled to reimbursement were based on his determinations that the parents had failed to establish that St. John's was an appropriate placement for G.M. during the 2009−10 and 2010−11 school years, the Court focuses solely on this issue.

Parents seeking reimbursement bear the burden of demonstrating that the private placement is appropriate. *Frank G.*, 459 F.3d at 364. The private school does not need to meet the IDEA criteria for a FAPE, but courts look to the same standards for guidance in determining whether the child's placement there is appropriate. *Id.*; *M.H.*, 712 F.Supp.2d at 163; *see A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 206 (S.D.N.Y. 2010) ("The standards for determining whether a private school placement is 'appropriate' under the IDEA closely resemble, but do not mirror, the standards for assessing the adequacy and appropriateness of the proposed public placement."). For example, the parents' placement "need not have certified special education instructors or an IEP [] to qualify as appropriate." *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F.Supp.2d 313, 326 (S.D.N.Y. 2005). Parents also need not show that the placement "furnishes every special service necessary to maximize their child's potential" to qualify for reimbursement. *Frank G.*, 459 F.3d at 365; *see M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000) ("The test for parents' private placement is not perfection."). Whether a private placement is appropriate "turns on whether [the] placement . . . is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207). "No one factor is necessarily dispositive" to this inquiry, and courts consider the totality of the circumstances in determining whether that placement "reasonably serves a child's individual needs." *Id.* The ultimate question is whether the placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *Gagliardo*, 489 F.3d at 115 (emphasis in original) (internal quotation marks omitted); *see Frank G.*, 459 F.3d at 165 (noting that parents "need only demonstrate that the placement provides 'educational instruction specially designed to meet the unique needs of a

handicapped child, supported by such services as are necessary to permit the child to benefit from instruction[]'") (quoting *Rowley*, 458 U.S. at 188−89).

### III. The SRO's Decisions Denying Tuition Reimbursement Merit Deference

As a preliminary matter, the Court finds that the SRO's decisions are well-reasoned and his findings are well-grounded in the evidence. The SRO's decisions thoroughly and carefully explored the evidence in the hearing record, consisting of hundreds of pages of transcript and over 40 exhibits. In reversing the IHO's determinations, the SRO considered the testimony of numerous witnesses, and reviewed evaluations and reports concerning G.M. The SRO also cogently explained the reasons for his conclusions, which were well-supported by citations to the applicable legal standard and relevant portions of the administrative record. Deference to the SRO's decisions is therefore appropriate. *See Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011) (deference is "particularly appropriate when the [SRO's] review has been thorough and careful"). Additionally, where, as here, "an SRO has clearly demonstrated a better command of the record and supported [his] conclusions through better legal and factual analysis than an IHO," the Court has "little difficulty deferring to the SRO's opinion." *M.W.*, 725 F.3d at 139.

Moreover, the preponderance of the evidence in the record supports the SRO's conclusions that St. John's was not an appropriate placement for G.M. for the 2009−10 and 2010−11 school years. The SRO denied reimbursement for both years based on a finding that there was a "paucity of evidence" in the hearing record describing G.M.'s educational program at St. John's. (First SRO Decision at 14; Third SRO Decision at 14.) The SRO highlighted that, at the first due process hearing, the parents produced no witnesses from St. John's, and the only documentary evidence from St. John's was G.M.'s 2009−10 report card. (First SRO Decision at

14.)  The SRO noted that G.M.'s mother wished to transfer him to St. John's so that he could have "some social interaction, be safe, and 'maybe . . . focus on his studies" (*id.* (citing 10−129 Tr. 385)), and that G.M.'s therapist testified that St John's was appropriate because G.M. "would be in a different environment" (*id.* (citing 10−129 Tr. 616−20, 768−70)).  While there was evidence that St. John's provided G.M. with a peer mentor, G.M.'s mother also acknowledged that G.M. "was not receiving special education services" at St. John's.  (*Id.* (citing 10−129 Tr. 458, Ex. H−25).)  The SRO therefore concluded "that the parents did not meet their burden to demonstrate how the program provided at [St. John's] was specially designed to meet the student's unique needs for the 2009−10 school year, and thus, the parents are not entitled to tuition reimbursement."  (*Id.* (citing *Gagliardo*, 489 F.3d at 115).)  Having reached this conclusion, the SRO did not address the issue of whether equitable considerations supported the parents' claim.  (*Id.* at 15.)

With regard to the parents' reimbursement request for 2010−11, the SRO found that the evidentiary record again failed to provide information about the program supports and services provided to G.M. at St. John's.  (Third SRO Decision at 14.)  Despite the fact that the SRO had based his prior decision largely on the absence of concrete information about St. John's program, the only supplemental evidence submitted by the parents in the second due process hearing consisted of a tuition invoice from St. John's for the 2010−11 school year, G.M.'s 2010−11 report card, his academic transcript, a letter waiving the school's "world language" requirement, G.M.'s discipline report for 2010−11, and a parental release form allowing a St. John's staff member to obtain records from G.M.'s private therapist, dated December 14, 2009.  (*Id.*)  Again, there was no indication in the record from the second due process hearing that G.M. had received special education services at St. John's in 2010−11.  (*Id.* at 14−16.)

Reviewing G.M.'s mother's testimony regarding how St. John's addressed G.M.'s needs, the SRO observed that she could only offer that St. John's staff "encouraged him. They advised him. I don't know of anything else. I'm sure they did many things, but I wasn't there." (*Id.* at 14 (citing 11−153 Tr. 314−16).) The SRO also described testimony from G.M.'s mother and guidance counselor indicating that G.M. met with his guidance counselor "once or twice a week" to help him "cope on a regular basis." (*Id.* (citing 11−153 Tr. 289, 348−49).) According to the guidance counselor, his initial meetings with G.M. focused on academics, and although he "encouraged [G.M.] to get more involved and to socialize with other students," he ultimately accepted G.M.'s preference to remain by himself while in school. (*Id.* at 14−15 (citing 11−153 Tr. 472−73, 475−79).) G.M.'s mother confirmed that she and the guidance counselor agreed to help G.M. focus on relationships outside of school and that G.M. "was becoming more and more social outside of school." (*Id.* 14 (citing 11−153 Tr. 289−90).)

The SRO also reviewed testimony from G.M.'s private therapist. The SRO noted the therapist's opinion that St. John's was an appropriate placement because he was not subject to the stressors at the District school, and St. John's provided "a level of security and safety for [G.M.] to continue to do well based on the trauma that he experienced, the social anxieties he struggled with, [and] the isolation". (*Id.* at 15). In support of this opinion, the therapist explained that St. John's "provided a lot of contact, a lot of support . . . .[H]e saw a guidance counselor on a regular basis. I think at one point . . . he had seen a pastor there." (*Id.* (citing 11−153 Tr. 389, 393, 394−95).) The therapist stated that St. John's seemed to "regulate any situation" to which G.M. may have "reacted in a negative way" and had "mechanisms . . . to provide emotional support, social support, academic structure support and . . . by having the counselors available, they recognized that . . . the student did suffer . . . clinical depression." (*Id.*

(citing 11−153 Tr. 389, 391−92, 395).)  The SRO observed, however, that the therapist had only met with G.M. twice in September 2010 and once in November 2010, and had no direct contact with G.M. after November 2010.  (*Id.*).  The therapist also confirmed that she did not have any direct contact with St. John's staff, and had no personal knowledge of the nature of the services and supports St. John's provided to address G.M.'s social relationships or academic performance.  (*Id.* at 15−16 (citing 11−153 Tr. 434−36, 440−43).)  Rather, much of the therapist's knowledge of St. John's programs was based on about a dozen conversations with G.M.'s mother over the course of the 2010−11 school year.  (*Id.*)  The SRO concluded that the parents had not satisfied their burden to demonstrate that the program at St. John's was specially designed to meet G.M.'s needs for 2010−11.  (*Id.* at 16.)  Based on this conclusion, the SRO again did not reach the issue of whether equitable considerations supported the parents' reimbursement claim.  (*Id.*)

In their appeals to this Court, Plaintiffs contend that the SRO "misapprehended the limited scope of special education and related accommodations GM required; namely, a general education setting where he would not be subject to the stressors he had to contend with at [the District school]."  (11 CV 3634 Dkt. 49 at 11.)[9]  Plaintiffs assert that G.M.'s "overriding special education need" was "a placement where he would not be subject to the bullying and harassment he endured at [the District school]" (11 CV 3634 Dkt. 58 at 22−23), and therefore the focus should have been on whether St. John's "afforded him a means to forgo the program of home tutoring . . . and instead allowed him to attend school in a general education environment, without being subject to the stressors which necessitated his removal from [the District school]" (11 CV 3634 Dkt. 49 at 2).  This is incorrect.  Far from "misapprehending" the nature of G.M.'s

---

[9] Citations to documents on the Court's docket refer to internal pagination rather than the pagination assigned by the ECF system.

needs, the SRO specifically acknowledged parents' concerns that G.M. be placed in a general education setting and not be subjected to harassment and bullying. (First SRO Decision at 14; Third SRO Decision at 15−16.) However, the SRO properly found that while "the removal of a student from a particular school building in which that student was exposed to peer bullying confers educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not," the parents had failed to meet their burden of showing how the program at St. John's was "specifically designed" to meet G.M.'s "unique needs," as required for reimbursement under IDEA. (Third SRO Decision at 16 (quoting *Gagliardo*, 489 F.3d at 115).) By requiring the parents to support the propriety of their choice of school with concrete evidence of special programming that was provided by St. John's, the SRO did not, as the Plaintiffs contend, impose a "heightened standard." (*See* 11 CV 3034 Dkt. 49 at 15.) While the IDEA does not mandate that parents show that a private placement furnishes every special service need by their child, it does require a showing, based on the totality of the circumstances, that there was *some* design in place for meeting the unique needs of the child. The record relating to G.M.'s 2009−10 and 2010−11 enrollment at St. John's is devoid of such evidence. Here, the SRO correctly based his finding on the lack of evidence that the private education obtained by G.M.'s parents was reasonably calculated to address G.M.'s unique emotional and psychological needs.

While Plaintiffs maintain that G.M. did not require academic supports if removed from the stressors at the District school, Plaintiffs also assert that G.M. had emotional and psychological disabilities as a result of chronic bullying and harassment at the District school. (10−129 Ex. 1.) Plaintiffs specifically claim that G.M. suffered from paranoid episodes, anxiety, adjustment disorder, and depression. (Pl. 56.1 St. ¶¶ 3−5.) His therapist testified that G.M.

struggled with social anxieties and isolation, and would be helped by mechanisms to provide emotional support, social support, academic structure support, and counselors who recognized G.M's clinical depression. (11−153 Tr. 389, 391−93, 394−95.) Yet Plaintiffs have failed to explain in any detail how St. John's offered G.M. services to address his disabilities, and what mechanisms were in place to give him the support and structure he needed to address his feelings of social anxiety and isolation. As the SRO pointed out, G.M.'s mother could only offer that the St. John's staff generally provided G.M. encouragement and support. There is a dearth of information regarding any strategies the St. John's guidance counselor implemented during his meetings with G.M. to permit G.M. to progress socially and psychologically. Indeed, the record suggests that the guidance counselor focused on academics and relationships *outside* of school, rather than developing G.M.'s socialization among peers within St. John's education setting. The record further confirms the counselor's decision to accept G.M.'s preference for remaining by himself at St. John's. (11−153 Tr. 318−20, 474, 477, 479.) Plaintiffs have not presented evidence that St. John's had staff trained in dealing with anxiety, adjustment disorders, or depression to allow G.M. to better cope. (*See id.* Tr. 314−16, 471−72.) Nor is the fact that St. John's provided G.M. with a peer mentor sufficient to overturn the SRO's determination that the program at St. John's was not appropriate to meet G.M.'s needs. (*See* 10−129 Ex. H−25.) Though the general educational environment at St. John's may have been one where rules were enforced and bullying was not tolerated[10] and where staff "encouraged" the students, these benefits are nothing more than "the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not," and do not warrant a grant of tuition reimbursement under the IDEA, or disturbing the SRO's denial of reimbursement

---

[10] Plaintiffs acknowledge that they did not submit evidence at the administrative proceedings of an actual policy prohibiting fighting and violent behavior. (11 CV 3634 Dkt. 61 at 4.)

in this case. *Gagliardo*, 489 F.3d at 115; *see Stevens ex rel E.L. v. N.Y.C. Dep't of Educ.*, 09 CV 5327, 2010 WL 1005165, at *9 (S.D.N.Y. Mar. 19, 2010); *Weaver*, F. Supp. 2d at 525.[11]

Plaintiffs also contend that the SRO improperly ignored evidence that G.M. displayed social progress at St. John's. Plaintiffs rely on G.M.'s therapist's testimony that G.M. displayed positive mood, entered into good relationships with teachers and guidance counselors, and exhibited social involvement with peers at St. John's. (11 CV 3634 Dkt. 58 at 23.) As further evidence that St. John's was an appropriate placement, Plaintiffs cite to the fact that G.M. completed the 2010−11 school year successfully in a general education setting. (*Id.* at 23−24.) However, none of these contentions undercut the SRO's conclusions. As previously described, the SRO took the therapist's testimony into account, but was not persuaded by her conclusions since she had no direct knowledge of St. John's program and did not meet with G.M. after November 2010. (Third SRO Decision at 15−16.) Furthermore, while evidence of progress is helpful in determining the appropriateness of a placement, it is not determinative, since the focus must remain on whether there existed a program specifically designed for G.M.'s unique needs. *See Frank G.*, 459 F.3d at 364; *Gagliardo*, 489 F.3d at 112; *see also C.L. v. Scarsdale Union Free Sch. Dist.*, 10 CV 4315, 2012 WL 983371 at *12 n.17 (S.D.N.Y. Mar. 22, 2012) (upholding SRO's determination that placement school was inappropriate despite testimony that the student was "happier, more self−confident, and less anxious" while attending private placement). Even where the record evidences success in a private placement, "courts should not disturb a state's

---

[11] In making this determination, the Court is not minimizing the seriousness of G.M.'s circumstances or the importance of educating *all* children in an environment free of bullying and harassment. But those are not the goals protected by the IDEA's provisions governing reimbursement for parents' unilateral placement of their child in an alternate school purportedly to address a disability. Rather, bullying and harassment at school are issues more properly addressed through anti-discrimination laws, as alleged in Plaintiffs' companion case, 10 CV 5484, in which the Court has partially denied the District's summary judgment motion.

denial of IDEA reimbursement where" as here, "the chief benefits of the school are the kind of . . . advantages . . . that might be preferred by parents of any child, disabled or not." *M.H.*, 685 F.3d at 252 (quoting *Gagliardo*, 489 F.3d at 115).

Moreover, evidence of G.M.'s uneven social progress at St. John's provides significant support to the SRO's conclusion. *See Weaver*, 812 F. Supp. 2d at 525. G.M.'s therapist noted in October 2009 that G.M. felt "isolated from his peers," "presents anxiety and anger about his negative adjustment and social problems at school" and suffered "social phobia." (10−129 Ex. H−20.) In December 2009, his therapist noted that G.M. complained about "being confronted and harassed by peers at St. John's" and that his mother reported that G.M. "continue[d] to absent himself from his peers and fe[lt] threatened[.]" (*Id.* Ex. H−22.) The therapist's notes from January 22, 2010 indicated that St. John's staff expressed concerns regarding confrontational incidents between G.M. and other students. (*Id.* Ex. H−25.) Prior to his second year at St. John's, G.M. expressed feelings of anxiety to his therapist related to returning to St. John's. (11−153 Tr. 403−07, 444−47.) Additionally, the record evidences that the guidance counselor at St. John's accepted G.M.'s preference to remain by himself at school, and focused on building relationships outside of St. John's. (11−153 Tr. 318−20, 47−77, 479.) These facts demonstrate that G.M.'s continuing need for psychosocial services went unaddressed at St. John's, and thus support the conclusion that Plaintiffs did not meet their burden under the IDEA to justify their tuition reimbursement request. *See M.S.*, 231 F.3d at 105 ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where . . . the district court's decision [is] based solely on the record that was before the SRO.") In sum, based on the preponderance of the evidence and giving appropriate deference to the SRO's decision, the Court finds that G.M.'s parents are not

entitled to reimbursement for G.M.'s tuition under the IDEA, and affirms the SRO's two decisions denying reimbursement for the 2009−10 and 2010−11 school years. Having thus found, the Court need not address whether equitable considerations support reimbursement.

## IV.    Attorneys' Fees

In any case brought under the IDEA, a federal district court, "in its discretion, may award reasonable attorneys' fees" to certain prevailing parties. 20 U.S.C. § 1415(i)(3)(B)(i). A "prevailing party" is "one who has been awarded some relief by the court." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001). It is well-established that "a plaintiff who receives IHO−ordered relief on the merits in an IDEA administrative proceeding is a 'prevailing party.'" *A.R. ex rel. R.V. v. N.Y.C. Dep't of Educ.*, 407 F.3d 65, 75 (2d Cir. 2005). However,"[s]howing that a school district failed to provide the free appropriate public education required by the IDEA" does not confer prevailing party status; rather, the party must be "entitled to some form of compensation as a result." *M.C. v. Lake George Cent. Sch. Dist.*, 10 CV 1068, 2013 WL 1814491, at *2 (N.D.N.Y. Apr. 29, 2013) (*citing J.G. v. Kiryas Joel Union Free Sch. Dist.*, 843 F.Supp.2d 394, 396 (S.D.N.Y.2012)).

Plaintiffs move for an order awarding them attorneys' fees and costs incurred in litigating the first and third due process hearings, which resulted in IHO decisions awarding G.M.'s parents tuition reimbursement. Plaintiffs assert that they are entitled to these fees even in the event that they do not prevail on the merits of their federal cases. (11 CV 3634 Dkt. 58 at 38.) Initially, the Court observes that Plaintiffs appear to have abandoned this request, as they failed to address Defendant's opposing arguments in their reply. (*See* 11 CV 3634 Dkt. 61.) *See also Struthers v. City of N.Y.*, 12 CV 242, 2013 WL 2390721, at *18 (E.D.N.Y. May 31, 2013) (deeming plaintiff's claim abandoned where plaintiff "fail[ed] to address defendants' argument

for summary judgment on [a] claim in his opposition brief"); *Otroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone."); *Taylor v. City of N.Y.*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). In any event, the Court agrees with the District that Plaintiffs cannot be considered "prevailing parties" for the IHO orders, since the SRO ultimately annulled both awards. *See M.C.*, 2013 WL 1814491, at *3 (finding that plaintiff was not a prevailing party entitled to attorneys' fees for IHO reimbursement award that was later annulled by SRO; however, plaintiff was a prevailing party for IHO's award of compensatory education that increased services, which was not annulled by SRO). *Cf. S.M. v. Evans−Brant Cent. Sch. Dist.*, 09 CV 686S, 2013 WL 3947105, at *4 (W.D.N.Y. July 31, 2013) (finding that plaintiff was prevailing party after receiving IHO-ordered relief on the merits, which was affirmed by the SRO). As Plaintiffs were not awarded any compensation for their claims, either monetary or in the form of additional services for G.M., they are not prevailing parties and are not eligible for related attorneys' fees.

## V.    <u>ADA and Rehabilitation Act Claims</u>

Plaintiffs' complaints assert claims pursuant to the ADA and Rehabilitation Act, neither of which had been raised in the IDEA administrative proceedings. Contrary to Plaintiffs' contentions (11 CV 3034 Dkt. 49 at 32), Plaintiffs must exhaust their administrative remedies for *any* federal claims related to the education of disabled children if "the issues raised . . . are those the IDEA is intended to remedy." *Gardner v. Uniondale Pub. Sch. Dist.*, 08 CV 847, 2008 WL

4682442, *8 (E.D.N.Y. Oct. 21, 2008); *see Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 247 (2d Cir. 2008); *Polera v. Bd. Of Ed. of Newburgh Enlarged City Sch.,* 288 F.3d 478, 487 (2d Cir. 2002).  This is true even if plaintiffs have not advanced any claims under the IDEA itself.  *See Stropkay v. Garden City Union Free Sch. Dist.*, 593 Fed. App'x 37, 40 (2014).  Thus, if the conduct or conditions Plaintiffs complain of in their ADA and Rehabilitation Act claims "are the type that the IDEA was intended to remedy−that is, related to the educational program and accommodations of a disabled child−administrative remedies must be exhausted prior to" commencing litigation.  *M.A. v. New York Dep't of Educ.*, 1 F. Supp. 3d 125, 142−44 (S.D.N.Y. 2014); *see Filaski v. Northport−E. Northport Union Free Sch. Dist.*, 06 CV 1019, 2011 WL 1260156, at *3 (E.D.N.Y. Mar. 30, 2011).  Failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction.  *Cave,* 514 F.3d at 245.

The purpose of the exhaustion requirement is to "'prevent[] courts from undermining the administrative process and permit[] an agency to bring its expertise to bear on a problem as well as correct its own mistakes.'"  *Polera,* 288 F.3d at 487 (quoting *Heldman ex rel. T.H. v. Sobol,* 962 F.2d 148, 159 (2d Cir. 1992)).  Even "[i]f the administrative process is not successful at resolving the dispute, it will at least have produced a helpful record because administrators versed in the relevant issues were able to probe and illuminate those issues for the federal court."  *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 112–13 (2d Cir. 2004).   In limited circumstances, exhaustion may be excused if a plaintiff can show that pursuing administrative remedies would have been futile.  *Coleman v. Newburgh Enlarged City Sch. Dist.,* 503 F.3d 198, 205 (2d Cir. 2007).  "To show futility, a plaintiff must demonstrate that 'adequate remedies are not reasonably available' or that 'the wrongs alleged could not or would not have been corrected

by resort to the administrative hearing process.'"  *Id.* (quoting *J.G. v. Bd. of Educ. of Rochester City Sch. Dist.,* 830 F.2d 444, 447 (2d Cir. 1987)).

Plaintiffs do not dispute that they did not articulate their ADA and Rehabilitation claims in the administrative forum.  (*See* 11 CV 3034 Dkt. 49 at 31−33.)  Plaintiffs' unexhausted ADA and the Rehabilitation Act claims are therefore barred from review if the issues complained of are the type that the IDEA was intended to remedy, and failure to exhaust is not otherwise excused.  *M.A.*, 1 F. Supp. 3d at 142−44.  All of Plaintiffs' ADA and Rehabilitation Act claims in their two federal actions concern the adequacy of the educational services offered by the District, or Plaintiffs' procedural IDEA rights, and therefore fall squarely within the ambit of the due process hearings afforded by the IDEA.  Specifically, Plaintiffs claim that the District deprived G.M. meaningful access to a FAPE by (1) insisting in January 2009 that G.M. return to the District school or continue home tutoring, (2) failing to discharge its "child-find" obligation in the 2010−11 school year; and (3) refusing to reimburse parents for tuition and related costs for both years.  (11 CV 3034 Dkt. 1 ¶¶ 70, 73−74, 78, 81−82; 12 CV 2603 Dkt. 1 ¶¶ 80, 82−84, 88, 90−92.)  The issues raised by Plaintiffs are precisely the kind that the IDEA was intended to address.  *See Cave*, 514 F.3d at 245 ("Parents are specifically entitled to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education.'") (quoting 20 U.S.C. § 1415(b)(6)(A)).  Indeed, the IHO and SRO decisions discussed both the District's failure to fulfill its child-find obligation and whether it was required to reimburse G.M.'s parents for tuition at St. John's.  There was also a factual record developed at the administrative level regarding whether the District school or home tutoring program were appropriate.  (*See, e.g.*, 10−129 Tr. 377−80, Exs. 10−11, C.)  These matters, which relate to

G.M.'s placement and deprivation of education services, are within the province of the IDEA and should have been exhausted during the State's administrative proceedings. *See M.A.,* 1 F. Supp. 3d at 145 (dismissing allegations that district removed student from class for separate instruction in violation of ADA and Rehabilitation Act for failure to exhaust); *P. v. Greenwich Bd. Of Educ.*, 929 F. Supp. 2d 40, 50−51 (D. Conn. 2013) (finding that the plaintiff failed to exhaust, where the plaintiff did not assert discrimination claim, despite having argued the factual basis for that claim, in the administrative proceedings); *Baldessare v. Monroe−Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 505 (S.D.N.Y. 2011) (finding exhaustion was necessary "[b]ecause all of Plaintiffs' claims of discrimination relate to the interplay between [the student's] disability and his education").

Plaintiffs do not explain how their claims are not redressable under the IDEA, and instead contend that the District should be foreclosed from mounting an exhaustion challenge because the District did not provide Plaintiffs with a procedural safeguards notice. (11 CV 3034 Dkt. 49 at 33 (citing *Dean v. Sch. Dist. of City of Niagara Falls, N.Y.*, 615 F. Supp. 2d 63, 72−75 (W.D.N.Y. 2009)).) Certainly, exhaustion is excused in some circumstances where parents have not been informed of their IDEA rights. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002); *Dean*, 615 F. Supp. 2d at 72. In contrast to those cases, however, Plaintiffs cannot claim to have been unaware of their IDEA rights as a result of any failure to provide notice. *Cf. Weixel*, 287 F.3d at 149 ("Exhaustion will be excused where…parents have not been notified that [administrative] remedies were available to them . . . because the failure of the defendants to notify [them] of their procedural rights under IDEA 'deprived [them] of the opportunity to take advantage of the procedural safeguards offered by the statute.'"). Plaintiffs initiated three due process complaints and were represented by counsel at two due process

hearings held pursuant to the IDEA, but nevertheless failed to articulate their discrimination claims. Plaintiffs have alleged no other facts from which the Court can conclude that exhaustion would have been futile or should be excused. Accordingly, Plaintiffs' ADA and Rehabilitation Act claims in these actions, *i.e.*, 11 CV 3634 and 12 CV 2603, are dismissed.[12]

## CONCLUSION

For the foregoing reasons, the District's motions for summary judgment (11 CV 3634 Dkt. 43; 12 CV 2603 Dkt. 30) are GRANTED and Plaintiffs' cross−motions for summary judgment (11 CV 3634 Dkt. 54; 12 CV 2603 Dkt. 39) are DENIED. The Clerk of Court is respectfully requested to enter judgment and close these actions.

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 28, 2015
       Brooklyn, New York

---

[12] The Court notes that Plaintiffs are pursuing ADA and Rehabilitation Act claims in the related 10 CV 5484 action, which focuses on the District's actions *prior* to G.M.'s enrollment at St. John's. As clarified in the oral argument in connection with the parties' summary judgment motions, Plaintiffs' disability discrimination claims in the 10 CV 5484 Amended Complaint challenge the District's failure to follow its suicide prevention policy, and its decision to remove G.M. from school without referring him to the CSE. The alleged discriminatory failure to follow the District's own policy would not have been remedied by the IDEA hearing process, and the failure to refer G.M. to a CSE at least arguably infected the IDEA proceedings by depriving administrators the ability to review evaluations which would have resulted from a CSE referral, or by depriving Plaintiffs the opportunity to present their claims. (*See* Third SRO Decision at 12.) For these reasons and insofar as Plaintiffs' claims rest on these acts, Plaintiffs were not required to exhaust them.